**UNITED STATES of America**

v.

**Larry Cranston BROOKS, Appellant.**

**No. 09–2097.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
LAR 34.1(a) Nov. 5, 2009.

Filed Nov. 9, 2009.

Donovan J. Cocas, Esq., Robert L. Eberhardt, Esq., Laura S. Irwin, Esq., Office of the United States Attorney, Pittsburgh, PA, for Appellee.

Melvin L. Vatz, Esq., Grossinger, Gordon & Vatz, Pittsburgh, PA, for Appellant.

Before: SCIRICA, Chief Judge, JORDAN and COWEN, Circuit Judges.

OPINION OF THE COURT

JORDAN, Circuit Judge.

Larry Cranston Brooks appeals from a judgment of conviction and sentence entered by the United States District Court for the Western District of Pennsylvania following Brooks's conviction for conspiracy to possess and distribute less than 100 grams of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Brooks raises three issues on appeal. First, he contends that the District Court erred by denying his motion to suppress intercepted wire communications. Second, he contends that the evidence presented at trial was insufficient to convict him of conspiracy. And, third, he argues that the District Court erred by refusing to instruct the jury that a buyer-seller relationship is not, by itself, proof of a conspiracy. Because we find no merit in his arguments, we will affirm.

## I. Background

In March of 2007, the Drug Enforcement Agency ("DEA") learned of a large-scale criminal organization, headed by Albert Tyrone McAllister, that was responsible for transporting heroin from New Jersey to Pittsburgh, Pennsylvania. The DEA learned through surveillance that heroin was being stored at a "stash house" located at 630 Margaretta Street in Pittsburgh's Braddock neighborhood. Further investigation revealed that the stash house was owned by McAllister. The DEA also learned that McAllister's cousin, Darnell Jackson, received incoming shipments of heroin at the stash house, which he then distributed in the Pittsburgh area.

Early in the investigation, the DEA used pen registers to track McAllister's dealings, but McAllister began changing cell phones frequently. Jackson, on the other hand, never changed his cell phone number and often communicated with major targets of the investigation. Accordingly, the DEA sought a Title III wiretap authorization for Jackson's cell phone by submitting to the District Court an application and accompanying affidavit specifying the need for the wiretap.[1] The DEA was granted authorization to tap Jackson's phone and began doing so on December 17, 2007. The wiretap authorization was renewed twice,[2] and Jackson's phone was monitored until March 4, 2008.

Brooks came under scrutiny shortly after the DEA began tapping Jackson's cell phone. The conversations between Brooks and Jackson revealed that Brooks was both a user and distributor of heroin. Working from the information obtained on the wiretap, police observed Brooks and Jackson exchange large amounts of cash for large quantities of heroin on multiple occasions. Sometimes those exchanges involved Jackson extending credit to Brooks by "fronting" him heroin. During their phone conversations, Brooks learned critical details about the roles, movements, and precautions taken by higher-ups in the

---

1. The affidavit in support of the application explained why several traditional investigative techniques were of limited effectiveness due to the wide-ranging character of the conspiracy. Specifically, the conspirators' use of prepaid phones with no subscriber information, the limited value of physical surveillance, the limited effectiveness of search warrants, grand jury subpoenas and witness interviews and the ineffectiveness of controlled buys were all cited as showing the necessity for the wiretap.

2. This was done via renewal applications filed by the DEA on January 15, 2008 and February 15, 2008. These applications contained essentially the same showing of necessity as the first application.

organization, including McAllister and the people who physically transported heroin to Pittsburgh.

The conversations thus revealed a high level of mutual trust between the two men, which was confirmed by other aspects of their relationship. Far from the treatment given an ordinary drug purchaser, Brooks had priority status and was given special treatment by Jackson in a number of ways. On several occasions, Jackson agreed to "hold" heroin for Brooks, meaning he promised not to sell it to anyone else. Jackson also alerted Brooks when he was expecting a shipment of high quality heroin and promised to sell to Brooks before anyone else, telling him "I'm gettin' you first." (Tr. No. 3818 at 2:32–3:09.)[3] This special treatment also included Jackson going out of his way to get Brooks the best quality and price possible. During one conversation, Jackson even agreed to exchange a better quality batch of heroin for a low-quality batch he had sold to Brooks.

In return, Jackson was given special treatment by Brooks as well. Brooks trusted Jackson enough to make him his go-to source, telling him, "just always hold something for me; I'll buy the sh—from you, dog." (Tr. No. 2240 at 1:30–1:33.) On one occasion, when Jackson's heroin supply began to run dry, Brooks attempted to find someone who would sell Jackson bulk quantities of heroin and offered to extend Jackson credit. During that time, Brooks went so far as to reverse roles and send Jackson heroin to tide him over.

The conversations between Brooks and Jackson also revealed that Brooks bought heroin from Jackson on behalf of Brooks's nephew. Brooks discussed with Jackson the price to be paid for that heroin, and, on more than one occasion, he attempted to ascertain the quality of the heroin Jackson was receiving so that his nephew could determine how much heroin to buy.

By the end of March 2008, the DEA was ready to dismantle the drug operation, and it executed a search warrant at the Braddock stash house in early April 2008. A grand jury subsequently returned a one-count indictment charging Brooks with conspiracy to possess and distribute less than 100 grams of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). He was arrested the same day.

Before trial, Brooks filed a motion to suppress the intercepted wire communications, arguing that the requirements set forth in 18 U.S.C. § 2518 had not been satisfied. Specifically, he argued that the applications for wiretap authorization did not contain sufficient facts to justify a wiretap and failed to show that other investigative techniques had been, or were likely to be, insufficient. The District Court denied the motion.

At trial, Brooks's defense was that, although the evidence showed heroin transactions between him and Jackson, there was not a sufficient basis to find him guilty of conspiracy to distribute heroin. Accordingly, in his Requested Jury Instructions, Brooks included a specific instruction entitled "Proof of Drug Transaction Does Not Establish Conspiracy," which read as follows:

> Even if you believe that the evidence establishes that Larry Brooks either bought heroin from or sold heroin to Darnell Jackson that does not, in and of itself, amount to proof of an illegal agreement to distribute heroin between the two individuals. Drug transactions are, by their very nature, transactions

**3.** References to "Tr. No." are to the track numbers on the compact disc recording of the conversations caught on the wiretap.

between two people, and a drug transaction does not constitute a conspiracy between those two people.

* * *

Thus, you must be satisfied, beyond a reasonable doubt, that the Government has proved that the alleged transactions between Brooks and Jackson are not simply buyer-seller transactions, but rather that they involved each other in the common goal of distributing heroin to others. It must be proved that the conspirators had a mutual stake in the activities of the other person that extended beyond any individual transactions. Even should you find that the Defendant or Jackson was involved in distributing heroin to others that alone does not prove that they entered into a mutual agreement to do so. For example, a person who buys drugs from somebody has not necessarily agreed to be a member of a larger conspiracy in which the seller may be involved. Conversely, the mere fact that a person sells drugs to a purchaser, who then resells those drugs to others, does not prove that the original seller has conspired with his purchaser to distribute drugs. You must be satisfied that the evidence has established, beyond a reasonable doubt, the unity of purpose, intent to achieve a common goal and agreement to work together toward that goal between the conspirators to find Larry Brooks guilty of conspiracy. Otherwise, you must acquit him.

(App. at A25–26.)

The District Court refused to instruct the jury with the exact language requested by Brooks, but it did indicate that Brooks's instruction would be given "in other words." (App. at A160.) When Brooks's attorney objected to the omission of Brooks's requested instruction, the Court reiterated that his request had been granted in other words. The Court further informed Brooks's attorney that he was free to present his defense theory to the jury, which he did. Although the District Court allowed Brooks's attorney to explain his legal theory to the jury, it also rightly instructed the jury that, with respect to the applicable law, the jury was to be guided only by the Court, not by the lawyers. Specifically, the Court stated:

> It is the Court's job to decide what rules of law apply to the case. . . . This is the Court's job. It is not the job of the lawyers. So while the lawyers may have commented during the trial and in their arguments on some of these rules, you are to be guided only by what the Court says about it.

(App. at A164.)

The jury convicted Brooks of conspiracy, as alleged in the indictment, and Brooks timely filed this appeal.

## II. Discussion[4]

### A. Motion to Suppress

Brooks argues that his motion to suppress evidence of intercepted wire communications should have been granted because the wiretap authorizations were issued without a showing of necessity, as is required by 18 U.S.C. § 2518.[5] "We review de novo the question of whether a full and complete statement of necessity

---

4. The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

5. 18 U.S.C. § 2518(10)(a)(i)–(iii) permits any "aggrieved person to move to suppress the contents of any wire or oral communication intercepted pursuant to that chapter." An "aggrieved person" is defined by 18 U.S.C. § 2510(11) as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."

for a wiretap was made in the application. Once it is determined that the statement was made, we will review the court's determination of necessity for an abuse of discretion." *United States v. Phillips*, 959 F.2d 1187, 1189 (3d Cir. 1992).

Pursuant to 18 U.S.C. § 2518(1)(c), an application for a wiretap order must contain: "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Likewise, before authorizing a wiretap, the authorizing judge must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c). However, the burden of proof imposed on the government in this regard is "not great," *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.1975), and the government is not required to exhaust all other investigative procedures before resorting to electronic surveillance. *United States v. Williams*, 124 F.3d 411, 418 (3d Cir.1997). Rather, evidence that normal investigative techniques reasonably appear unlikely to succeed if tried is sufficient. *Id.* When determining whether that standard has been satisfied, "[t]he government's showing is to be tested in a practical and commonsense fashion." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir.1992). Although mere generalities and conclusory statements will not suffice, "[t]he government need only lay a factual predicate sufficient to inform the judge why other methods of investigation are not sufficient." *Williams*, 124 F.3d at 418; *McGlory*, 968 F.2d at 345. Finally, "a court may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Williams*, 124 F.3d at 418.

■ Brooks contends that the government's wiretap applications were insufficient because they contained mere generalities and did not set forth with sufficient specificity the reasons why, in this particular investigation, ordinary investigative measures would fail. He points to the fact that, at least initially, the government had substantial success by using investigation methods other than wiretapping Jackson's phone. And, while Brooks concedes that the government subsequently faced significant obstacles that frustrated the progress of its investigation, he nonetheless maintains that the government should have continued to use traditional methods of investigation, rather than "leapfrogg[ing] into the invasive techniques of wiretapping." (Appellant's Op. Br. at 31.)

Contrary to Brooks's allegations of generality, the record reveals that the three wiretap applications demonstrated in sufficient detail that other techniques appeared unlikely to succeed. The affidavits submitted with the applications explain why several traditional investigative techniques were of limited effectiveness due to the size and structure of the conspiracy. As mentioned earlier, the conspirators' use of prepaid phones with no subscriber information, the limited value of physical surveillance, the limited effectiveness of search warrants, grand jury subpoenas and witness interviews, and the ineffectiveness of controlled buys were all noted, and they suffice to demonstrate that a wiretap was likely to succeed where other techniques had failed or would fail in gathering essential information about the heroin distribution ring. Accordingly, we conclude that the requirements of 18 U.S.C. § 2518 were satisfied and that the District Court did not err in denying the motion to suppress.

### B. Evidence of Conspiracy

■ Turning to whether the government offered sufficient evidence to support

the jury's finding that Brooks was guilty of conspiracy to possess and distribute heroin, we apply a particularly deferential standard of review. *United States v. Dent,* 149 F.3d 180, 187 (3d Cir.1998). We consider the evidence in the light most favorable to the government and will uphold the conviction if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Gibbs,* 190 F.3d 188, 197 (3d Cir.1999).

To sustain a conviction for conspiracy, the government must establish: (1) a unity of purpose between the alleged conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal. *Id.* Our Circuit has held that, without more, a simple buyer-seller relationship is insufficient to establish that a buyer was a member of the seller's conspiracy. *United States v. Pressler,* 256 F.3d 144 (3d Cir.2001); *Gibbs,* 190 F.3d at 197; *United States v. Price,* 13 F.3d 711, 727 (3d Cir.1994). However, we have also acknowledged that "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." *Gibbs,* 190 F.3d at 198. In *Gibbs,* we articulated our approach to conspiracy cases involving drug transactions as follows:

> In cases where the defendant's only involvement in the conspiracy appears to be drug purchases, courts have looked to the surrounding circumstances to determine whether the defendant is a mere buyer who had such limited dealings with the conspiracy that he cannot be held to be a conspirator, or whether he has knowledge of the conspiracy to the extent that his drug purchases are cir-

cumstantial evidence of his intent to join that conspiracy.

*Id.* at 199.

In making this determination, some of the factors courts have considered include: the length of the affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; whether there is a demonstrated level of mutual trust; whether the buyer's transactions involved large amounts of drugs; and whether the buyer purchased drugs on credit. *Id.* at 199–200. Although these factors are not dispositive, "the presence of one or more of these factors furthers the inference that the buyer knew he was part of a larger operation and hence can be held responsible as a coconspirator." *United States v. Iglesias,* 535 F.3d 150, 156 (3d Cir.2008).

Brooks's primary contention is that, even when viewed in the light most favorable to the government, the evidence put forth at trial shows nothing more than a mere buyer-seller relationship between himself and Jackson. The record, however, is to the contrary. The government presented ample evidence of the various factors identified in *Gibbs.* In addition to showing numerous drug transactions involving large amounts of heroin, the government adduced other evidence demonstrating a high level of mutual trust between Brooks and Jackson. Each gave the other special treatment. Jackson went out of his way to get Brooks the best possible price and quality of heroin, sold heroin to Brooks before anyone else, and placed drugs on hold for Brooks. In return, Brooks promised to buy from Jackson in the future and even attempted to find Jackson a supplier when Jackson had trouble obtaining heroin. Both men extended credit to each other. And Brooks served as a go-be-

tween in his nephew's heroin transactions with Jackson. Based on this evidence, a reasonable juror could have concluded that Brooks and at least one other person shared the common goal of distributing heroin, the intent to achieve that goal, and a tacit agreement to cooperate to achieve it.

## C.  Jury Instruction

Finally, we address Brooks's argument that the District Court erred by refusing to give the jury a proposed instruction on the buyer-seller relationship. We review de novo a district court's refusal to instruct the jury on a defense theory when, as in this case, the defendant objected to the refusal to give the charge. *United States v. Stewart,* 185 F.3d 112, 124 (3d Cir.1999); *see also United States v. Price,* 13 F.3d 711, 724 (3d Cir.1994) ("We review de novo the legal sufficiency of jury instructions to which a defendant objected, but so long as the court properly articulated the relevant legal criteria we review the particular language used on an abuse of discretion standard.").

In *United States v. Hoffecker,* we stated that: "A defendant is entitled to a theory of defense instruction if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial." 530 F.3d 137, 176 (3d Cir. 2008). Accordingly, we have held that a District Court's refusal to give a proposed jury instruction amounts to reversible error only if the omitted instruction is legally correct, not substantially covered by other instructions, and so important that its omission prejudiced the defendant. *United States v. Urban,* 404 F.3d 754, 779 (3d Cir.2005); *United States v. Davis,* 183 F.3d 231, 250 (3d Cir.1999).

Brooks contends that, while the District Court correctly stated the basic elements of conspiracy, it erred because it did not address the particular defense theory that a buyer-seller relationship is not, in and of it itself, proof of a conspiracy. He further contends that without such an instruction the jury was led to believe that evidence of the conversations between Jackson and Brooks suggesting drug sales would, without more, suffice to establish a conspiracy between them. Again, his contentions are unpersuasive.

■ Although Brooks's proposed instruction contained some correct statements of the law, it also contained notable errors. For example, the proposed instruction provided that, in order to find Brooks guilty, the jury had to find that "there was an agreement between Brooks, Jackson, and others to distribute heroin to others." That is not the law and may have confused the jury by implying that Brooks, Jackson, and unspecified "others" all had to be shown to be participants in a conspiracy, when the government only needed to show that Brooks conspired with one other person to distribute heroin. *See United States v. Greenidge,* 495 F.3d 85, 100 (3d Cir.2007). Brooks's proposed instructions also incorrectly stated that "it must be proved that the conspirators had a mutual stake in the activities of the other person that extended beyond any individual transactions." In actuality, "a conspirator's stake in the venture is not an essential element of the crime of conspiracy." *United States v. McKee,* 506 F.3d 225, 242 (3d Cir.2007). Thus, Brooks was not entitled to his jury instruction as drafted.

Brooks's complaint that the jury should have been given a defense theory instruction is also unwarranted because the essence of his theory did find support in an instruction the District Court gave. The Court told the jury that "a person who has

no knowledge of the conspiracy but who happens to act in a way that advances some object or purpose of the conspiracy"—as would be true of the buyer in a simple buyer-seller transaction—"does not thereby become a member of the conspiracy." (App. at A176–77.) Given that the "district court has substantial discretion with respect to specific wording of jury instructions and need not give [a] proposed instruction if [its] essential points are covered by those that are given," *see Douglas v. Owens,* 50 F.3d 1226, 1233 (3d Cir.1995) (citations omitted), and since a defendant "is not entitled to prescribe exact language of" a theory-of-defense instruction, the instruction the Court gave was more than adequate to accommodate the defense theory of the case. *Id.* At the invitation of the Court, Brooks's counsel argued that theory to the jury without any objection by the government. There was, in short, a foundation in the instructions for the argument, and Brooks, through counsel, made it. There was thus no error in the District Court's handling of Brooks's request for a defense theory instruction.

## III. Conclusion

The District Court properly denied Brooks's motion to suppress and did not err in refusing to adopt Brooks's language for a defense theory jury instruction. Further, the evidence presented at trial was sufficient for a reasonable trier of fact to conclude that Brooks was guilty of conspiracy to distribute heroin, as charged. We will therefore affirm the judgment of the District Court.